## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Sean M. Spicer**
2308 Mt. Vernon Avenue #415
Alexandria, VA 22301; and

**Russell T. Vought**
300 Independence Avenue SE
Washington, DC 20003,

　　　　　　　*Plaintiffs*,

v.

**Joseph R. Biden Jr.**, in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500;

**Catherine M. Russell**, in her official capacity as
director of the White House Presidential Personnel
Office
Eisenhower Executive Office Building
1650 Pennsylvania Avenue NW
Washington, DC 20502;

**Katherine L. Petrelius**, in her official capacity as
Special Assistant to the President in the White
House Presidential Personnel Office
Eisenhower Executive Office Building
1650 Pennsylvania Avenue NW
Washington, DC 20502;

**Charles A. "Dutch" Ruppersberger III**, in his
official capacity as Chairman of the United States
Naval Academy Board of Visitors
121 Blake Road
Annapolis, MD 21402;

**Raphael J. Thalakottur**,
in his official capacity as Designated Federal
Officer of the United States Naval Academy Board
of Visitors
121 Blake Road
Annapolis, MD 21402; and

**United States of America**
950 Pennsylvania Avenue NW
Washington, DC 20530,

　　　　　　　*Defendants*.

Civil Action No. 1:21-cv-2493-DLF

**PLAINTIFFS' OPPOSITION
TO MOTION TO DISMISS**

## TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Statement of the Case ..................................................................................................... 3

    A.   Legal framework ................................................................................................ 3

    B.   Facts and proceedings ....................................................................................... 5

Legal Standard ................................................................................................................ 7

Argument ........................................................................................................................ 7

    I.   The President lacks authority to remove Board appointees. .................................... 7

    A.   The statute's three-year term of office prevents at-will removal. ............................... 8

        1.   History supports this interpretation. ........................................................... 9

        2.   Context supports this interpretation. ......................................................... 13

        3.   Precedent supports this interpretation. ...................................................... 19

    B.   No constitutional problem exists under current precedent. ......................................... 25

    II.   This Court has jurisdiction. ......................................................................... 27

Conclusion ...................................................................................................................... 29

**INTRODUCTION**

"Under our constitutional scheme, tenure in office is during good behavior, for statutorily fixed periods and stipulated terms, or at the discretion of the appointing officer." *Kalaris v. Donovan*, 697 F.2d 376, 398 (D.C. Cir. 1983). For presidential appointees to the Naval Academy's Board of Visitors, Congress chose the second route, providing that appointees "serve for three years" and staggering the terms so that the President may appoint "two persons each year to succeed the members whose terms expire that year." 10 U.S.C. § 8468(b).

Two interpretations of this statute have been presented. One interpretation is supported by the D.C. Circuit's description of such terms as providing a "fixed" "tenure" that removes the appointing officer's "discretion," the historical understanding of terms of office from Article I's six-year Senate term to *Marbury* to state precedents, the Supreme Court precedents closest in time to the statute's enactment, the need to give this term provision an effective meaning, contextual clues from other statutes that combine a term provision with a removal provision, Congress's purpose to protect the independence of a Board that it created, and hitherto-unbroken executive practice. The other interpretation is arguably supported by dicta in two cases involving officials who exercised substantial executive power, unlike these Board members.

Though this Court's preliminary view favored the latter interpretation, Plaintiffs respectfully disagree. If the President can unilaterally remove Board members before the end of their statutory term, he can rely only on his Article II authority. That is because the statute unambiguously provides appointees with a three-year tenure, which "shall continue" until their successor is appointed. 10 U.S.C. § 8468(b). The government still cannot explain the point of the staggered term provision under its interpretation, since that interpretation would permit the President to reshape all appointments at will. "[C]ourts presume that Congress has used its scarce

legislative time to enact statutes that have some legal consequence." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006) (Kavanaugh, J.). So why would Congress have carefully amended the Board with staggered terms of office—just a few years after *Humphrey's Executor v. United States* approved Congress's "power to fix the period during which [appointees] shall continue" "to maintain an attitude of [agency] independence" (295 U.S. 602, 629 (1935))— to achieve nothing?

In its previous order, this Court relied heavily on two pre-*Humphrey's Executor* precedents, *Parsons v. United States* and *Myers v. United States*. But neither is controlling. Both involved constitutional questions about officials who exercised substantial executive power, so neither could set forth a binding holding about the interpretation of term provisions for other types of officials. Neither involved staggered term provisions, whose purpose is to prevent wholesale changeover at the executive's whim. And both decisions were superseded by *Humphrey's Executor*, which "disapproved" of a broad reading of *Myers* and held that Congress may "fix[] a term of office, in accordance with many precedents." 295 U.S. at 623, 626.

For the question of statutory interpretation here, what matters is the original public meaning of the statute in 1948, just a few years after *Humphrey's Executor*. Congress's intent is clear from the text as understood then: to protect the independence of the Board. John Marshall, James Madison, Joseph Story, and innumerable precedents, commentaries, and other legal texts have all understood fixed terms to prevent unilateral removal. A ruling for the government on the statutory question would depart from these understandings, as well as the D.C. Circuit's understanding in *Kalaris* and elsewhere. The government provides no evidence that the original public meaning was somehow contrary to this history and context.

That leaves only the government's underdeveloped constitutional argument. Under current precedent, congressional protections for multimember expert bodies that do not exercise substantial executive power are consistent with the Constitution. The government does not contend that the Board here exercises such power, for it is a purely advisory agency. If Congress can protect any agency officials from removal, it can protect Board members—most of whom are themselves members of Congress or their designates.

Congress created and designed the Board of Visitors, like many other independent agencies, to hold the executive branch accountable. President Biden's attempted government-wide purge of dissenting voices is a direct threat to that congressional goal. As predicted in Plaintiffs' preliminary injunction motion, President Biden's attempted purge has already hurt the Board, as it apparently could not obtain a quorum to gather for its most important and statutorily required annual meeting last month.[1] So not only has President Biden tried to remove dissenting voices, he has kept the agency from exercising its oversight role at all. To protect the agency independence designed by Congress, the Court should deny the government's motion to dismiss.

## STATEMENT OF THE CASE

### A.    Legal framework

The Naval Academy is a federal service academy that educates officers for commissioning, mostly into the United States Navy and United States Marine Corps. The Naval Academy Board of Visitors is an independent agency created by Congress. Its mission is to "inquire into the state of morale and discipline, the curriculum, instruction, physical equipment, fiscal affairs, academic methods, and other matters relating to the Academy" and submit an annual report of its views and

---

[1] *See* Office of the Superintendent, Board of Visitors, https://perma.cc/U26B-UJJW (last visited Jan. 10, 2022) ("The board is not expected to meet quorum requirements. Without quorum, no official business can be conducted."); ECF No. 6-2, § 2.04 ("quorum of six members").

recommendations. 10 U.S.C § 8468(e)-(f). To fulfill these mandates, the Board conducts regular visits to the Academy. *Id.* § 8468(d).

The Board does not wield any executive power. It also does not exercise "quasi-legislative" or "quasi-judicial" powers. Under its Charter, it "shall provide independent advice and recommendations." ECF No. 1-1, Charter ¶ 3; *see id.* ¶ 2 (describing the Board as "a non-discretionary advisory committee"). Each Board "member, based upon his or her individual experiences, exercises his or her own best judgment concerning matters before the Committee, does not represent any particular point of view, and discusses and deliberates in a manner that is free from conflicts of interest." ECF No. 1-2, Membership Balance Plan ¶ 3; *accord* Charter ¶ 12.

The Board consists of 15 members, including

(1) the chairman of the Committee on Armed Services of the Senate, or his designee; (2) three other members of the Senate designated by the Vice President or the President pro tempore of the Senate, two of whom are members of the Committee on Appropriations of the Senate; (3) the chairman of the Committee on Armed Services of the House of Representatives, or his designee; (4) four other members of the House of Representatives designated by the Speaker of the House of Representatives, two of whom are members of the Committee on Appropriations of the House of Representatives; and (5) six persons designated by the President.

10 U.S.C § 8468(a); *see* Charter ¶ 12.

By statute, the six presidential appointees serve staggered three-year terms. The President may appoint "two persons each year to succeed the members whose terms expire that year." 10 U.S.C. § 8468(b). Under the statute, "any member whose term of office has expired shall continue to serve until his successor is appointed." *Id.* And "[i]f a member of the Board dies or resigns, a successor shall be designated for the unexpired portion of the term by the official who designated the member." *Id.* § 8468(c). The statute makes no provision or allowance for at-will presidential removal during or even after the three-year term. Only death, resignation, or a new appointment at or after the term ends an appointee's service.

The Board members select the Chairman. Charter ¶ 12. The Chairman has responsibilities over the Board's operations and meetings, including to certify all meeting minutes. *See* ECF No. 1 (Compl.) ¶ 21; 5 U.S.C. Appendix, Federal Advisory Committee Act § 10(c). And the Board's Designated Federal Officer is designated by the Department of Defense. Charter ¶ 8. The Designated Federal Officer (or his approved alternate) must attend all Board meetings. *Id.* He "approves and calls all Board meetings; prepares and approves all meeting agendas; and adjourns any meeting when [he] determines adjournment to be in the public interest or required by governing regulations or DoD policy and procedures." *Id.*; *see* 5 U.S.C. Appendix, Federal Advisory Committee Act § 10(e)-(f); Compl. ¶ 22

### B.    Facts and proceedings

Mr. Spicer was appointed to the Board by former President Donald J. Trump in 2019 to a term originally ending December 30, 2021. Compl. ¶ 24. As noted, "any member whose term of office has expired shall continue to serve until his successor is appointed." 10 U.S.C. § 8468(b). No successor has been appointed. Mr. Vought was appointed to the Board by former President Donald J. Trump in 2020 to a term ending December 31, 2023. Compl. ¶ 25. Yet on September 8, 2021, Mr. Spicer and Mr. Vought received materially identical e-mails from Katherine L. Petrelius, Special Assistant to the President in the White House Presidential Personnel Office. Those emails said:

> I am writing to request your resignation from the Board of Visitors to the United States Naval Academy. If we do not receive your resignation by end of day today, you will be terminated. Attached is a formal letter. On behalf of the Office of Presidential Personnel, thank you for your service.

*Id.* ¶ 28.

The emails each included an attached letter from Catherine M. Russell, director of the White House Presidential Personnel Office. The letters said:

> On behalf of President Biden, I am writing to request your resignation as a Member of the Board of Visitors to the U.S. Naval Academy. Please submit your resignation to me by the close of business today. Should we not receive your resignation, your position with the Board will be terminated effective 6:00 pm tonight. Thank you.

*Id.* ¶ 29; *see* ECF Nos. 1-3, 1-4.

Mr. Spicer and Mr. Vought have not resigned and will not resign in response to President Biden's request, and they are facing a threat of imminent termination. Compl. ¶ 30.[2]

Before the Board's December 6, 2021 meeting, Plaintiffs moved for a preliminary injunction. ECF No. 3. This Court denied the motion. ECF No. 9 ("Op."). The Court agreed that Plaintiffs have standing and that their injury can likely be redressed by orders against Defendants Ruppersberger and Thalakottur. Op. 3–6. The Court held that Plaintiffs lacked a sufficient likelihood of success on the merits, stating that under "controlling decision[s] of the Supreme Court," "term-of-office provisions do not themselves limit the removal power." Op. 10. The Court said that "barring [Board appointees'] removal would raise serious constitutional concerns." *Id.* (internal quotation marks omitted). And the Court found that the other injunctive factors did not favor immediate relief. Op. 11. The government now moves to dismiss. ECF No. 12 ("Mot.").

In a case raising similar issues, another court in this district recently echoed this Court's jurisdictional conclusions and its preliminary view of the merits, dismissing a suit against the President for purporting to remove a member of the Administrative Conference of the United States before the end of his term. *See Severino v. Biden*, No. 21-0314, 2022 WL 168321 (Jan. 19, 2022). All relevant points raised by that court are addressed below.

---

[2] The government continues to insist that Plaintiffs' membership was already terminated, pointing to their absence on one website (ECF No. 12 ("Mot."), at 3–4) yet "ignoring another official government website that today lists them as Board members." ECF No. 7, at 19; *see also id.* at 21 n.17. Plaintiffs received no notice of termination.

**LEGAL STANDARD**

When deciding whether to grant a motion to dismiss, this Court "must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged." *Harris v. Bowser*, 369 F. Supp. 3d 93, 98 (D.D.C. 2019). "The district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Id.* (cleaned up) (quoting *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)); *see also JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 520 (D.D.C. 2014).

**ARGUMENT**

**I.      The President lacks authority to remove Board appointees.**

In its preliminary injunction order, the Court found that Plaintiffs "are unlikely to succeed on the challenge to their removals." Op. 6. According to the Court, under "a controlling decision of the Supreme Court" (*Parsons*), "term-of-office provisions do not themselves limit the removal power." Op. 10. The Court emphasized its view that Board members are "plainly executive officials," as they serve on a Board whose "only role" "is to advise the president on the performance of a quintessentially executive function: the command and supervision of the Armed Forces." *Id.* Thus, the Court said that "barring their removal would raise serious constitutional concerns." *Id.* (internal quotation marks omitted).[3]

Beginning with the statutory question, the best interpretation of what the public would have understood the statute's fixed terms to mean when enacted in 1948 is as a limitation on the

---

[3] This Court's decision to "deny a preliminary injunction does not constitute law of the case for the purpose of further proceedings and does not limit or preclude the parties from litigating the merits." *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012); *see also Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*, 2021 WL 3577367, at *5 (D.D.C. Aug. 13, 2021).

President's ability to remove. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (focusing on "the ordinary public meaning of [a statute's] terms at the time of its enactment"). Whatever *Parsons* held 50 years earlier about a unique statutory scheme involving a core executive official does not answer the question in this case. Chief Justice Marshall, James Madison, Joseph Story, the Supreme Court in *Humphrey's Executor*, and the D.C. Circuit in *Kalaris* all share the same view of term-of-office provisions, the one that reflects the statute's ordinary meaning: a three-year term is a three-year term. The point of such terms is to prevent removal prior to the end of the term. Allowing such removal would render the provision and its carefully staggered terms all but meaningless. The President could remove any or all Board appointees at any time. There is no reason to attribute such an ineffective provision to Congress. More, adopting the government's interpretation would render statutory language passed alongside the provision surplusage too. And agency independence—the goal of congressionally mandated term provisions—would be undermined by an unfettered presidential power to remove disfavored appointees.

Because the statutory text is clear, the Court cannot avoid any constitutional question. The only way then to rule for the government is to hold that Board members are executive officials exercising executive power and subject to unfettered presidential control under Article II. But current Supreme Court precedent bars that holding. As the D.C. Circuit has explained, "The Constitution permits Congress to establish fixed terms for members of tribunals that are independent of the Executive Branch." *Kalaris*, 697 F.2d at 398 (emphasis omitted). The government still refuses to say that the Board exercises executive power, so the Board's operation cannot interfere with the President's Article II authority.

A.      **The statute's three-year term of office prevents at-will removal.**

According to this Court's previous order, "[t]he Supreme Court has consistently held that 'the power of removal from office is incident to the power of appointment' 'absent a specific

provision to the contrary.'" Op. 6. That is true. But a term provision *is* such a provision: "it is a general rule, that an office is held at the will of either party; *unless a different tenure is expressed*." *In re Hennen*, 38 U.S. 230, 260 (1839) (emphasis added). "The rule, supported by authorities too numerous to cite, is that the power of removal is not incident to the power of appointment where the extent of the tenure of office is fixed by the statute." *State ex rel. Williamson v. Wannamaker*, 48 S.E.2d 601, 605 (S.C. 1948).

The "traditional tools of statutory interpretation" are "the statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1021–22 (D.C. Cir. 2014). All those tools here point to the same conclusion: a three-year staggered tenure prevents removal before the end of the tenure. And no precedent casts doubt on this understanding of what the public would have read the statute to mean in 1948.

### 1. History supports this interpretation.

Since at least *Marbury v. Madison*, the public meaning of fixed-term appointments is that they are "not revocable; but vest[] in the officer legal rights, which are protected by the laws of this country." 5 U.S. 137, 162 (1803). The evidence shows that "[s]ince before the Founding, offices held for a term of years, in the absence of constitutional or statutory language to the contrary, were designed to be inviolable: Short of impeachment, their holders could not be removed before the end of their terms." Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 5 (2021). Plaintiffs have shown that this understanding was commonly shared by Marshall, Madison, Story, and "state and federal case law, treatises, and legislative history." ECF No. 3-1, at 19–22; *e.g.*, 119 A.L.R. 1437 (originally published in 1939) ("It is a general rule that officers appointed for a fixed and definite term are not removable except for cause, in the absence of express statutory or constitutional authority to remove without cause.").

Indeed, many state cases supports Plaintiffs' view of the common American understanding of fixed terms of office. *E.g.*, *People ex rel. Finlay v. Jewett*, 6 Cal. 291, 293 (1856) (holding that "where the tenure is defined, then the officer shall hold for his full term" and collecting cases from other states); *Speed v. Crawford*, 60 Ky. 207, 213 (1860) (striking down a state provision allowing removal at pleasure as inconsistent with the state constitution's requirement for a "term," which "is uniformly used to designate a *fixed and definite period of time*," and collecting cases (emphasis in original)); *Collins v. Tracy*, 36 Tex. 546, 547 (1872) ("The principle that the power of removal is incident to the power of appointment, is applicable only in those cases where the office is held at the pleasure of the appointing power, and the tenure not fixed by law as in this case."); *Territory ex rel. Wade v. Ashenfelter*, 1887-NMSC-013, ¶ 60, 4 N.M. 93, 12 P. 879, 897 (holding that a term preempts "the right to remove," and collecting cases); *Hallgrene v. Campbell*, 46 N.W. 381, 383 (Mich. 1890) ("[T]he presumption must be that the legislature intended that every officer appointed for a fixed period should be entitled to hold his office until the expiration of such period unless removed therefrom for cause after a fair trial."); *Stage v. Coughlin*, 22 Ohio Dec. 211, 219 (Ohio Com. Pl. 1912) ("The term of an office means the period of time for which the incumbent has a right to it" (internal quotation marks omitted)); *State v. Rhame*, 75 S.E. 881, 883 (S.C. 1912) (collecting "unbroken authority in other jurisdictions" showing "that the power of removal is not incident to the power of appointment, where the extent of the term of office is fixed by the statute"); *Holder v. Anderson*, 128 S.E. 181, 183 (Ga. 1925) ("But the power of removal is not incident to the power of appointment, where the extent of the term of office is fixed by the statute."); *Beasley v. Parnell*, 9 S.W.2d 10, 11 (Ark. 1928) ("[T]he power of removal is not incident to the power of appointment, where the extent of the term of office is fixed by Constitution or statute."); *Wentz v. Thomas*, 15 P.2d 65, 71 (Okla. 1932) (similar); *State ex rel. Nagle v. Sullivan*, 40 P.2d 995, 998

(Mont. 1935) (describing the "American view" as being that "provision for appointment for a fixed term constitutes [a] restraint [on the power of removal], and, in the absence of any provision for summary removal, one appointed for a fixed term can be removed only for cause" and citing both 23 Am. & Eng. Ency. of Law 437 and cases "from many jurisdictions"); *Collison v. State ex rel. Green*, 2 A.2d 97, 100 (Del. 1938) (explaining that "the connotation of 'term' as applied to an office is that of a fixed and definite period" and collecting citations); *Adie v. Mayor of Holyoke*, 21 N.E.2d 377, 380–81 (Mass. 1939) ("[T]he right of removal does not exist in the appointing power, in the absence of some constitutional or statutory provision, where the term of the official is fixed by law for a definite period."); *State ex rel. Williamson v. Wannamaker*, 48 S.E.2d 601, 605 (S.C. 1948) ("It is the fixity of the term that destroys the power of removal at pleasure." (citing 43 Am. Jur. Sec. 183, p. 32; Annotations 99 A.L.R. 336, 363, 119 A.L.R. 1437)); *Schluraff v. Rzymek*, 208 A.2d 239, 239 (Pa. 1965) (collecting cases holding "that where the legislature creates a public office and provides that the holders of that office shall be appointed for fixed terms with staggered expiration dates, the presence of staggered terms indicates a legislative intent that the holders of the office are not removable by the appointor at his pleasure" (emphasis omitted)); *see* Ilan Wurman, *In Search of Prerogative*, 70 Duke L.J. 93, 142 n.205 (2020) ("[O]ffices with tenures for a term of years were historically understood not to permit removal until the term expired."); *cf. State v. Prater*, 189 N.W. 334, 335 (N.D. 1922) ("There is practically no controversy upon the law. It is practically conceded that a public officer, appointed for a definite term with a delegated power of removal granted to the appointive power, can only be removed for cause after notice and hearing. This is the rule of the common law.").

The government has not addressed the above cases before, and it has had no response to the unbroken history otherwise, save a (wrong) footnoted suggestion that this is an "academic"

issue "subject to debate." ECF No. 7, at 5–6. Nothing could be more relevant to the original public meaning than how the public has, at all relevant times, understood such term provisions. And the Court did not question this "wide array of historical materials" in its previous order. Op. 10. Thus, it is undisputed that "from the nation's founding to after the time the relevant provision was adopted, the broad understanding of term provisions has been that they limit at-will removal during the term." ECF No. 3-1, at 23.

It is also undisputed that no President has ever before tried to remove a Board member during the three-year term. *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding practice of the government can inform our determination of what the law is." (cleaned up)). And against that background, "Congress has reenacted and reauthorized the Board multiple times, always preserving the three-year term." ECF No. 3-1, at 24 & n.3.

The Court previously analogized to Article III's lifetime tenure and various for-cause removal provisions. Op. 6–7. But consider the constitutional provisions governing the President and Senators. The President "shall hold his Office during the Term of four Years" and can be "removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." U.S. Const. art. II, §§ 1, 4. Absent the impeachment section, would the government contend that the four-year term is merely a limit and not a guarantee? Or take Senators, who serve staggered six-year terms. U.S. Const. art. I, § 3. If those terms are limits and not guarantees, may States recall Senators? *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 890 (1995) (Thomas, J., dissenting) (noting that "the Framers denied to the States" "a power of recall" "when they specified the terms of Members of Congress"); Congressional Research Service, RL30016, *Recall of Legislators and the Removal of Members of Congress from Office* i (Jan. 5, 2012) ("[N]o Member of Congress has ever been recalled in the history of the United

12

States.").

Thus, the Constitution too reflects the long-settled historical understanding of terms of office as a tenure guaranteed the officeholder. Interpreted in light of that undisputed public meaning, the statute here does not permit the President to remove Board members at will before the end of their statutory tenure.

### 2.  Context supports this interpretation.

It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Wilson*, 290 F.3d 347, 355 (D.C. Cir. 2002) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Interpretation must consider the provision's "broader context" and the Act's "structure . . . as a whole," as well as related "legislative acts." *Id.* at 354.

Several context clues point to the same conclusion about public meaning as the history. First, under the statute, "[t]he persons designated by the President serve for three years each," and "any member whose term of office has expired shall continue to serve until his successor is appointed." 10 U.S.C. § 8468(b). The plain meaning of this language—"serve[s] for three years" and "shall continue to serve"—is that the appointee is guaranteed at least a three-year term (or whatever remains of that term). This language points to a right to serve during the initial three-year term and a right to "continue to serve" until a new appointee is named.

Next, "[a] cardinal principle of interpretation requires [courts] to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (cleaned up). The Court previously rejected the relevance of the surplusage canon, reasoning that it "applies only when statutory language is ambiguous." Op. 10. But the government has never made that argument, for good reason: the canon against surplusage, like other contextual canons, is part of understanding statutory meaning, given that

"[c]ontext is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law* 167–68 (2012); *see id.* at 174–79 (identifying the surplusage canon as a contextual aid in "consider[ing] the entire text").

The "very purpose" of canons like the one against surplusage "is to decipher the legislature's intent" by determining textual meaning. Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 117 & n.28 (2010). Thus, courts apply the surplusage canon to decide what a statute means and *whether* it is ambiguous.[4] Ignoring the surplusage problems here commits the "interpretive fault" of not considering the whole law, "in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, *supra*, at 167; *see id.* at 174 ("Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable." (internal quotation marks omitted)).

Regardless, assuming the statutory language is not clearly in Plaintiffs' favor, at minimum it must be ambiguous. Chief Justice Marshall would have read it just like Plaintiffs do. Some terms of office—Senators', for instance—are universally read in line with Plaintiffs' interpretation. Plaintiffs have shown that what this Court correctly described as "a wide array of historical materials" spanning centuries—adding here many state precedents—supports this reading. Op. 10; *supra* Part I.A.1. The government has never responded to these materials, which speak closely to

---

[4] *E.g.*, *Nielsen v. Preap*, 139 S. Ct. 954, 969–72 (2019) (considering the canon against surplusage in determining a statute's meaning, while refusing to apply the canon against constitutional avoidance because *that* canon "has no application absent ambiguity" (cleaned up)); *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.) (considering surplusage canon to determine meaning); *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (applying the "endlessly reiterated principle of statutory construction that all words in a statute are to be assigned meaning" at *Chevron* step one (ellipses omitted)); *NetCoalition v. SEC*, 715 F.3d 342, 351–52 (D.C. Cir. 2013) (applying the canon to determine the meaning of the "plain text," which was "not ambiguous"); *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 614 (D.C. Cir. 2013) (same); *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139–40 (D.C. Cir. 1995) (rejecting legislative history arguments because "the plain language of the statute is clear," while still considering surplusage arguments).

the question of original public meaning. And in terms of ordinary meaning, if asked "does someone appointed for 3 years get to serve for 3 years," at least some people would answer yes. Likely most people (now and in 1948, and including most members of Congress) would.[5] Presumably that's

---

[5] *See, e.g.*, cases cited *supra* Part I.A.1; 96 Cong. Rec. 518–19 (1950) (statement of Sen. McCarthy) (stating that the purpose of providing the Chief of Naval Operations with a definite term was "to make sure that the Chief of Naval Operations can feel some security, that he can come before congressional committees and discuss freely and without threat of removal, the problems of the military organization"); 71 Cong. Rec. 164 (1929) (statement of Rep. William Larsen) (discussing the Federal Farm Board, contrasting the Board appointees and their staggered six-year fixed terms with its Chairman, for whom "[n]o term is fixed," so "[h]e may be the chairman of that board for one day, or he may be the chairman for one year, or as long as the President of the United States sees fit to let him act as such"—which Rep. Larsen tried to address by offering an amendment "to fix the term of office" and allow the Chairman "to hold office on an equality with other men on the board"); 71 Cong. Rec. 126 (1929) (statement of Rep. Charles Robert Crisp) (similar description of Board members as having "tenure" but the Chairman "serv[ing] during the pleasure of the President"); 83 Cong. Rec. 4581–82 (1938) (statement of Rep. Taber) (describing an amendment that "weakens the Comptroller General by making him subject to removal at the will of the President, instead of providing for a fixed term for the Comptroller General of 15 years. This 15-year term would insure his independence."); 86 Cong. Rec. 5167 (1940) (quoting a *New York Times* editorial: "The effect of the proposed change would be to put control of civil aviation back in the hands of a Secretary of Commerce, who, however upright and efficient, is still a political appointee without fixed term."); 95 Cong. Rec. 6854 (1949) (statement of Sen. Byrd) (arguing that the appointee should have a "definite term of office," otherwise "the Secretary of Agriculture could make new appointments to the board, effective the next day, and he would not have to make a report of that matter to the Congress"); 81 Cong. Rec. 6752–53 (1937) (statement of Rep. O'Mahoney) (successfully urging adoption of a "definite term" of 5 years for members of a board within the Department of Agriculture because they "should not hold office at the pleasure of the Secretary"); 82 Cong. Rec. 1909 (1937) (statement of Sen. Hayden) (introducing a bill that would give presidential appointees to the National Resources Board fixed terms while withholding such terms from other designees and providing that those designees are "subject to removal" at the "discretion" of the designating authority); 93 Cong. Rec. 5251 (1947) ("Mr. Hill: '[The appointment] is for no fixed term?' Mr. Magnuson: 'His service is to be at the pleasure of the President.'"); 83 Cong. Rec. 6410 (1938) ("The pilots feel that the position of safety director will not be independent . . . because there is no definite term of office and there is very little doubt but what this position will change with each administration, which makes it political."); 95 Cong. Rec. 6829 (1949) (statement of Sen. Kem) ("If the directors are appointed by the President for a definite term . . . they have a vested right in their position," and "[t]he Supreme Court will sustain them in their position to the extent that they cannot be fired."); 92 Cong. Rec. 8213 (1946) (statement of Sen. Magnuson) (discussing the President's removal power and stating that the "Administrator [was] subject to removal by the President" at will because "[n]o term is fixed in the bill"); Memorandum from Ramsey Clark, Deputy Att'y Gen., DOJ, to Jake Jacobsen, The White House

why no President had attempted such a government-wide disregard of terms of office.

So the surplusage problems with the government's interpretation must be accounted for, and the government still has no response. The worst problem is that the government's interpretation deprives the term-of-office provision itself of essentially all meaning. "[I]nterpretation always depends on context," "context always includes evident purpose," and "evident purpose always includes effectiveness." Scalia & Garner, *supra*, at 63. Statutory interpretation should thus "further[], not hinder[]" the text's "manifest purpose." *Id.*

Here, the entire point of staggered term provisions is to prevent a "complete change [in membership] at any one time." *Humphrey's Executor*, 295 U.S. at 624. That purpose is rendered null under the government's interpretation, which leaves the composition of Board appointees at any time to the President's complete discretion. The term would accomplish nothing other than giving the appointee a default stop date—a stop date with no import, since the President could remove the appointee at any time before, and the appointee would continue to serve indefinitely after the stop date until replaced by the President. That result "would be so nearly indistinguishable from normal" appointment procedures "as to deprive this special [term] provision of any effect, and to thwart the apparent intent of Congress in enacting" it. *Asiana Airlines*, 134 F.3d at 398; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (declining to adopt an interpretation that "would in practical effect render [the provision] superfluous in all but the most unusual circumstances").

"[C]ourts presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence." *Fund for Animals*, 472 F.3d at 877 (Kavanaugh, J.). Again, why would Congress have amended the Board with staggered terms of office, a few years after

---

(July 2, 1965) (stating that where a term is "prescribed by statute, it is reasonably clear that" an office holder cannot be removed before the end of that term); ECF No. 3-1, at 16 (discussing *Report of the National Commission on State Workmen's Compensation Laws*).

*Humphrey's Executor* approved Congress's "power to fix the period during which [appointees] shall continue" as necessary "to maintain an attitude of [agency] independence"? 295 U.S. at 624, 629; *see* ECF No. 3-1, at 23 (recounting the historical development of this statute). The government still has no answer. Reading Board appointees' terms to be at the President's whim would "disrupt the system [Congress] meticulously put into motion," *Wilson*, 290 F.3d at 359, and render null the evident statutory purpose, *see Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199 (2020) (describing *Humphrey's Executor*: "staggered, seven-year terms enabled the agency to . . . avoid a 'complete change' in leadership 'at any one time'"); *Wilson*, 290 F.3d at 359 ("[I]n staggering the membership (among other features), Congress was insulating the Commission from carte blanche replacement at any given time.").

Yet another surplusage problem exists with the government's interpretation. At the same time Congress enacted the Board's terms, it passed many other statutes both providing a term *and* providing for presidential removal. ECF No. 3-1, at 25–26 & n.4 (collecting examples). Courts "presume differences in language like this convey differences in meaning." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) (cleaned up). Yet the government's interpretation would eliminate any meaning or effect from these provisions for presidential removal during a term. *Cf. Bowers v. Pennsylvania Lab. Rels. Bd.*, 167 A.2d 480, 484 (Pa. 1961) ("If the fixed five-year terms with staggered expiration dates, provided by the Parking Authority Law, did not imply, as a matter of statutory construction, that the tenure of appointed members should endure for their fixed terms, without being subject to removal at the pleasure of the appointing power, then why did the legislature expressly add that members of the Board may be removed at the will of the appointing power?").

Finally, the Board's status as an independent advisory body supports Plaintiffs'

interpretation. In its previous order, the Court said that "[b]ecause Board members lack any non-advisory authority, Congress had little cause to insulate them from removal." Op. 10. With respect, that is backwards. The Board is a creature of Congress, designed by Congress to provide an independent voice and oversight of the executive branch. The Board's Charter emphasizes this independence: "Each Board member is appointed to exercise his or her own best judgment," "without representing any particular point of view, and to discuss and deliberate in a manner that is free from conflicts of interest." Charter ¶ 12. The Board's lack of executive power suggests that the term provision should be read to preserve the agency's independence, in accord with its plain meaning. The agency's independence is important to its mission of providing the Naval Academy with expert advice, no matter who might be in power. *Cf. Humphrey's Executor*, 295 U.S. at 625–26 (explaining the value of "a body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official"); *Wiener v. United States*, 357 U.S. 349, 353 (1958) (considering "the nature of the [agency's] function" to be a "reliable factor for drawing an inference regarding the President's power of removal").

Very recent congressional actions confirm this independence. In the National Defense Authorization Act for Fiscal Year 2022, enacted a few weeks ago, Congress amended 10 U.S.C. § 8468 in two ways that emphasize the Board's independence. First, after the Biden administration prevented the Board from meeting for most of 2021,[6] Congress amended the statute to give "[a] majority of the members of the Board" power to "call an official meeting of the Board once per

---

[6] *See* Third Amended Complaint for Declaratory and Injunctive Relief ¶¶ 17–18, 125, *Stirrup v. Biden*, No. 21-1893 (D.D.C. filed Nov. 8, 2021); Heather Mongilio, *Naval Academy Board of Visitors Unable to Meet While Under Defense Secretary Review*, Stars and Stripes (July 31, 2021), https://www.stripes.com/branches/navy/2021-07-31/naval-academy-board-meeting-under-defense-secretary-review-2387715.html.

year." Pub. L. No. 117-81, § 555, 135 Stat. 1541, 1738–39. This amendment underscores Congress's intent for the Board to operate independently, not at the executive's fancy.

A second amendment "clarif[ied] that the authority to appoint successors to Presidential Appointees of the Board of Visitors of military academies whose terms have expired resides with the President." House Rules Committee, Joint Explanatory Statement to Accompany the National Defense Authorization Act for Fiscal Year 2022, at 101 (2021), https://rules.house.gov/sites/democrats.rules.house.gov/files/17S1605-RCP117-21-JES.pdf; *see also* 135 Stat. at 1738. This emphasis on appointees "whose terms have expired" makes sense only if those terms mean something.

In short, and as explained more below, the Board does not exercise executive power. It has several other indicia of independence, including "fixed terms of office," "separation from any Executive agency," and its "functions," all factors that contributed in *Humphrey's Executor* and *Wiener* to limitations on the President's removal power. *Kalaris*, 697 F.2d at 395 n.77. These attributes confirm the proper reading of the term-of-office provision—as preventing at-will removal before the expiration of the term.

### 3. Precedent supports this interpretation.

Dismissing other evidence of original meaning, the government and this Court's previous order relied on two inapposite precedents. In the Court's preliminary view, "[t]he Supreme Court squarely held in *Parsons* that term-of-office provisions do not independently limit the President's removal power." Op. 7. But the Court did not consider the unique statutory history in *Parsons*, the absence of a staggered term, or that the official there was a U.S. Attorney—a core executive official exercising substantial executive power. *See* ECF No. 3-1, at 18–19; ECF No. 7, at 10–11; Manners & Menand, *supra*, at 24 n.137 (describing *Parsons* as based on "the unusual drafting history of the relevant provision"). As the government admits, *Parsons* was a constitutional

avoidance case, ECF No. 6, at 32, and *Parsons* does not purport to change the universal (and undisputed) understanding of standard term-of-office provisions.

As several courts in this context have explained, "The entire opinion of Justice Peckham rests on the argument that under the Constitution and statutes of the United States, the office of district attorney and like federal offices fall *without the general rule and are not controlled by it*." *Holder v. Anderson*, 128 S.E. 181, 184 (Ga. 1925) (emphasis added, internal quotation marks omitted); *State v. Rhame*, 75 S.E. 881, 883 (S.C. 1912) ("[I]t appears, we think, beyond controversy that the *Parsons* Case is in no wise opposed to the rule that the power of removal is not an incident of the power of appointment if the length of the term is fixed by statute, and no authority to remove is conferred by the statute."); *Territory ex rel. Klock v. Mann*, 1911-NMSC-027, ¶ 1, 16 N.M. 211, 114 P. 362, 363 (similar); *Adie v. Mayor of Holyoke*, 21 N.E.2d 377, 381 (Mass. 1939) (similar).

This Court also relied on *Myers v. United States* as "confirm[ing]" *Parsons*. Op. 7. True, *Myers* dismissed *Marbury*'s description of terms of office as dicta, though other parts of *Myers* can be read to agree with that description.[7] In any event, that discussion was itself dicta, and nothing in *Myers* holds "that *Parsons* governs the construction of all term-of-office provisions." Op. 8; *see* ECF No. 7, at 11–12; Manners & Menard, *supra*, at 26 n.148 (*Myers* "does not squarely address whether its holding prevents Congress from limiting [removal] by establishing an office for a term of years."). *Myers* resolved only a constitutional question—and that resolution was "explicitly 'disapproved'" "[w]ithin less than ten years [by] a unanimous Court" in *Humphrey's Executor*. *Wiener*, 357 U.S. at 352.

Even if *Myers* had spoken to a statutory question, any change in the original public meaning

---

[7] *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given . . . the fixing of the term for which [offices] are to be appointed . . . .").

of fixed terms would change the result. Whatever Congress and the public might have thought about fixed terms generally after reading dicta in two decisions in 1897 and 1926, at minimum they would have understood such terms to limit removal power both before 1897 and after *Humphrey's Executor* in 1935. As to "term-tenured officials [with] no removal permissions" whose enabling "acts were written either before *Myers* was decided or after *Humphrey's Executor*," "[i]t is fairly clear that Congress intended to deprive the President of any removal authority." Manners & Menard, *supra*, at 73 n.dd1.

This Court previously emphasized that the statute in *Humphrey's Executor* combined a term provision with a for-cause removal provision. Op. 9. But *Humphrey's Executor* said that "[t]he statute fixes a term of office, in accordance with many precedents," recognizing Congress's view that "a fixed term was necessary to the effective and fair administration of the law" and that staggered terms would prevent a "complete change" in membership. 295 U.S. at 623–24. This is all wrong on the government's interpretation, under which the fixed term means almost nothing (and would not need "many precedents" in support). *Humphrey's Executor* held that Congress's "authority includes, as an appropriate incident, power to fix the period during which [appointees] shall continue, and to forbid their removal except for cause in the meantime." *Id.* at 630. The Court's use of "*shall* continue" and the comma casts doubt on any reading of *Humphrey's Executor* that turns on the for-cause removal provision. "Later decisions understood Humphrey's Executor to state the general meaning of fixed terms." ECF No. 7, at 9; *see Kalaris*, 697 F.2d at 395 ("*Humphrey's Executor*, which was the foundation of the *Wiener* decision, went to great lengths to limit its holding to cases where Congress had defined fixed terms for agency members." (citation omitted)). And the statute here echoes *Humphrey's Executor*, stating that even after the three-year term, the member "*shall continue* to serve until his successor is appointed." 10 U.S.C. § 8468(b)

(emphasis added).

Further, neither the government nor the Court answered the grammatical problems with reading unadorned term provisions one way while reading term provisions accompanied by for-cause removal provisions another. As explained, "it makes little sense to read a term without a removal provision as a mere limitation yet a term with a removal provision as a grant. Why would the officeholder have more protection under a statute expressly permitting his removal?" ECF No. 7, at 13–14.

This Court previously distinguished *Wiener v. United States*, saying that decision "found a removal restriction on the rationale that the relevant agency was an adjudicatory body." Op. 9 (cleaned up). But that is why *Wiener* inferred a *term provision*. Here, the term provision is explicitly in the statute, and *Wiener* establishes that a term provision is not subject to an "implied[]" removal power. 357 U.S. at 356. According to the Court in *Wiener*, "[t]he philosophy of *Humphrey's Executor*, in its explicit language as well as its implications, precludes such a claim." *Id.*; *see id.* ("Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.").

The Court in *Wiener* thus rejected the government's argument—identical to the one made here—that *Parsons* "established the terse formula that provisions for a term of office are in the nature of a limitation, not of a grant." Brief for the United States 74, *Wiener*, 1957 WL 87809 (Oct. 15, 1957); *see id.* at 72–76. Instead, it sided with the petitioner, who argued that the Court "should not treat the petitioner's term as were the terms of office discussed in *Parsons v. U.S.* (*supra*) or in the *Myers* case (*supra*) which concerned purely executive officials and functions." Brief for the Petitioner 33, *Wiener*, 1956 WL 89648 (Aug. 26, 1956). And, as discussed below, the Board of

Visitors exercises no more executive power than the agency in *Wiener*. If removal could not bring an end to the implied three-year term in *Wiener*, it cannot end the *express* three-year term here.

This Court also dismissed *Reagan v. United States*, 182 U.S. 419 (1901), Op. 9, but the D.C. Circuit has understood that decision to hold that agency members are "removable at will in the absence of a congressionally fixed term." *Kalaris*, 697 F.2d at 396. Once again, the government's interpretation would turn that holding on its head.

Next, this Court identified a handful of recent Supreme Court decisions that "did not strike down their respective term-of-office provisions." Op. 8–9. But those provisions were not challenged in any of those cases, so the Supreme Court had no warrant to strike them down or otherwise address them, particularly because the decisions make it obvious that the Constitution requires at-will removal for the executive officers in those cases. *See* ECF No. 7, at 14–15. And none of these cases centered on an original public meaning statutory inquiry but involved constitutional questions. To the extent those cases addressed statutory interpretation, they only echoed *Humphrey's Executor*'s understanding "that Congress ha[s] power to 'fix the period during which [agency members] shall continue in office, and to forbid their removal except for cause.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 493 (2010); *Seila Law*, 140 S. Ct. at 2199 (similar).

Finally, this Court briefly cited two D.C. Circuit decisions, Op. 9, but those decisions support Plaintiffs. As noted, in *Kalaris v. Donovan*, the D.C. Circuit said that "[u]nder our constitutional scheme, tenure in office is during good behavior, *for statutorily fixed periods and stipulated terms*, or at the discretion of the appointing officer." 697 F.2d at 398 (emphasis added). The court also said that "[t]he Constitution permits Congress to establish fixed terms for members of tribunals that are independent of the Executive Branch." *Id.* (emphasis omitted). "[W]here

Congress has neither created an Article III court nor established by legislation the terms for tenure and removal, the Constitution leaves the tenure of these officers to the discretion of the appointing officer." *Id.* And the court described "fixed terms of office" as an attribute of an agency appointment that "limit[s] the Executive's removal power." *Id.* at 395 n.77. The government's interpretation contradicts all these statements.

Likewise, in *Swan v. Clinton*, the D.C. Circuit said that "term limits do not always provide removal protection, at least when traditional executive branch officials are involved."100 F.3d 973, 982 (D.C. Cir. 1996). If the government's interpretation were correct, the D.C. Circuit should have said that "term limits never provide removal protection."[8]

The D.C. Circuit's decision in *United States v. Wilson* also supports Plaintiffs. There, the court said that, in accord with "widely held traditional understandings of statutes defining terms of office," a number of years "fixes the duration of the term" and a staggered provision "fixes the time of termination." 290 F.3d at 356. The Court emphasized that "the creation of staggered terms was one of several structural features" that make an agency "an independent, bipartisan entity," "insulate[d]" "from political influence." *Id.* at 360; *accord Borders v. Reagan*, 518 F. Supp. 250, 255 (D.D.C. 1981) ("The language of the statute makes clear that Congress did not intend that a member of the Commission serve only at the pleasure of the appointing authority or that he be removable at will; rather, once an appointment is made it is anticipated that the member will serve a complete term."), *vacated as moot*, 732 F.2d 181 (D.C. Cir. 1982) (per curiam).

Thus, precedent points in the same direction as the text, history, and context: terms of office limit the President's removal power. The most recent binding, on-point precedent is *Kalaris*, and

---

[8] This Court also noted a Third Circuit case adopting a broad reading of *Parsons*, based in part on policy concerns. Op. 9; *see* ECF No. 7, at 15. As shown above and previously, that broad reading is incorrect.

it supports Plaintiffs' reading of statutory terms as providing tenure protection against removal. The Board's terms have no other plausible meaning. The President's purported removal of Mr. Spicer and Mr. Vought (and many others) therefore violated the law.

### B.     No constitutional problem exists under current precedent.

Because the statute prohibits presidential removal during Board members' terms, the government can prevail only if Article II requires the President to have that authority. But the government continues to "accept[]" that "the Board does not wield *any* executive power." Mot. 6–7 (internal quotation marks omitted). If that is true, then the Board's operation cannot affect the President's exercise of his Article II executive power, and Board members are not "so central to the functioning of the Executive Branch as to require as a matter of constitutional law that [they] be terminable at will." *Morrison v. Olson*, 487 U.S. 654, 691–92 (1988).

In its previous order, this Court said that "the only role of Board is to advise the president on the performance of a quintessentially executive function: the command and supervision of the Armed Forces." Op. 10. It also said that "because Board members are plainly executive officials, barring their removal would raise serious constitutional concerns." Op. 10.

But under current precedent, the President has no constitutional prerogative to remove members of "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 140 S. Ct. at 2199–2200. Congress "championed" the Board, created it, gave it its duties, provides most of its members, and instructed the independence of its presidential appointees— protected by staggered terms. ECF No. 6-3, at 2–3. Again, "when Congress statutorily specifies the terms of tenure" for appointees who "are independent of the Executive Branch," "it does not infringe upon the autonomy of the Executive Branch." *Kalaris*, 697 F.2d at 398. Some have argued that this rule applies even to appointees who exercise executive power. *See generally* Manners & Menand, *supra*. But it certainly applies to members of a Board that, by the government's own

admission, does *not* exercise such power. As the Court in *Severino* agreed, "The Supreme Court has consistently held that Congress may 'provide tenure protections to certain inferior officers with narrowly defined duties.'" 2022 WL 168321, at *7 (quoting *Seila Law*, 140 S. Ct. at 2192).

"[A]n appointee who does not exercise executive power does not affect the President's ability to 'ensure that the laws are faithfully executed.'" ECF No. 3-1, at 28 (collecting cases). Board members who serve on a purely advisory body with no rulemaking, investigatory, enforcement, or adjudicative authority exercise no executive power. The Supreme Court has upheld removal provisions even for appointees who exercise much more executive power (*Humphrey's Executor*, *Wiener*, and *Morrison*), and the Court has recently adhered to those decisions. *E.g.*, *Seila Law*, 140 S. Ct. at 2199–2200. "If Congress can set a non-illusory term of office for *anyone*, it can set them for Board members." ECF No. 3-1, at 29. The Board's oversight of the Naval Academy does not mean that it exercises substantial executive power, for *Congress* has the constitutional authority to "maintain a Navy" and "make Rules for [its] Government and Regulation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644–46 (1952) (Jackson, J., concurring); U.S. Const. art. I, § 8.

Finally, if "Board members are plainly executive officials" who must be subject to removal by the President, Op. 10, that would mean that the President could also remove the rest of the Board: the congressional members (or their designates) who constitute a majority of the Board. Either the Board exercises "substantial executive power" or it does not. *Seila Law*, 140 S. Ct. at 2199–2200. Under current precedent, it does not, so the President has no constitutional authority to remove its members beyond Congress's statutory instruction. Plaintiffs have stated a claim, and the government's motion to dismiss should be denied.

## II.     This Court has jurisdiction.

This Court already held that it has jurisdiction, Op. 3, and the government "do[es] not re-raise [its rejected] jurisdictional argument here," Mot. 1 n.1. Though the government says in passing that the Court "likely" lacks jurisdiction over Mr. Spicer's claim because his initial term expired, Mot. 1, that argument too is incorrect. Among other reasons, the statute provides that "any member whose term of office has expired shall continue to serve until his successor is appointed." 10 U.S.C. § 8468(b). The government has not represented that any successor has been appointed, so Mr. Spicer remains a Board member. In any event, Mr. Vought's initial term does not expire until December 31, 2023. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) ("only one plaintiff must have standing").

On standing, the government does not contest this Court's prior holding "that it could grant effective relief by ordering several officials"—Defendants Ruppersberger and Thalakottur, in their capacities as the Board's Chairman and DFO, respectively—"'to treat the plaintiffs as full members of the Board.'" Mot. 1 n.1 (quoting Op. 5). Thus, contrary to the government's prior arguments, Mr. Spicer and Mr. Vought do not need a presidential order of "reappointment." ECF No. 6, at 1.

The government suggests that this Court "agreed that it likely lacked jurisdiction as to the President." Mot. 1 n.1. But the Court merely noted that "[a]s a general matter, federal courts lack jurisdiction to 'enjoin the President in the performance of his official duties.'" Op. 4 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)). At minimum, any such general prohibition would not apply to performance of ministerial duties. *See* Op. 4 n.1. Recognizing that Mr. Spicer and Mr. Vought remain Board members would be "ministerial": "nothing is left to discretion" and there is "no room for the exercise of judgment." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607–08 (D.C. Cir. 1974) ("*NTEU*"). It does not matter if their ongoing membership depends on the

court's resolution of "disputable legal question[s]." *Id.* at 603 & n.34. Recognizing their membership would be a ministerial act. *See, e.g.*, *Marbury*, 5 U.S. at 162 ("The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated . . . ."); *id.* at 158 (delivering the appointment "is a ministerial act"). More, courts—from the Supreme Court down—have repeatedly approved judgments against the President.[9]

In its preliminary injunction order, the Court cited Justice Scalia's solo partial concurrence in *Franklin v. Massachusetts*, in which he argued that "the President and the Congress . . . may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary." Op. 4 (quoting 505 U.S. 788, 827 (1992)). But even Justice Scalia did not dispute that "the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802 (plurality opinion); *see id.* at 827 n.2 (opinion of Scalia, J.). As shown, the duty here is purely ministerial. And Justice Scalia emphasized that, contrary to the government's view here, "review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive—just as unlawful legislative action can be reviewed, not by suing Members of Congress for the performance of their legislative duties, but by enjoining those congressional (or executive) agents who carry out Congress's directive." *Id.* at 828–29 (cleaned up) (collecting cases).

As to the presidential assistants, this Court previously said that they "lack authority over

---

[9] *E.g.*, *Clinton v. City of New York*, 524 U.S. 417, 425 n.9 (1998); *NTEU*, 492 F.2d at 616 ("[J]urisdiction in this case exists . . . to support the issuance of a writ of mandamus directing the President to effectuate the pay raise."); *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980) ("Mandamus is not precluded because the federal official at issue is the President of the United States." (citing *NTEU*)); *id.* at 926 n.17 (same for declaratory judgments); *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) ("the court's order must run directly to the President").

both appointments to the Board and the Board's operations." Op. 4. No doubt, an injunction against other Defendants (including the President) would be the more obvious route. But if the Court seeks to avoid enjoining the President, an order directing the same Defendants who issued the unlawful communication to retract that communication is likely to redress Plaintiffs' injury. As the Supreme Court has explained, "[s]uits against . . . Presidential aides . . . generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982). Courts routinely enjoin all sorts of executive officials, *see* ECF No. 3-1, at 33 & n.5, and the government has not explained why the assistants here are exempt from the rules that apply to other executive officials.

## CONCLUSION

The Court should deny the motion to dismiss.

Respectfully submitted,

REED D. RUBINSTEIN
D.C. Bar No. 400153
America First Legal Foundation
600 14th Street, NW, Fifth Floor
Washington, DC 20005
(202) 964-3721
reed.rubinstein@aflegal.org

*/s Christopher Mills*
CHRISTOPHER E. MILLS
D.C. Bar No. 1021558
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

January 24, 2022